```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
ANDREW SPENCER,                                             :
                              Petitioner,                   :
                                                            :    **MEMORANDUM DECISION**
                - against -                                 :    **AND ORDER**
                                                            :
MICHAEL CAPRA,                                              :    17 Civ. 2179 (BMC)
                                                            :
                              Respondent.                   :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief from his conviction on one count of second degree criminal weapons possession, two counts of third degree criminal weapons possession, one count of third degree assault, and one count of second degree menacing. The facts will be set forth more fully below, but to summarize, petitioner's conviction arose out of a street fight where he allegedly punched and then pulled a gun on an individual who, unbeknownst to him, was an off-duty police officer. He was sentenced to 15 years on the top count with lesser sentences on the other counts to run concurrently. Petitioner argues that the state trial court deprived him of his Sixth Amendment right to present a defense, and that he was prejudiced by ineffective assistance of counsel because his lawyer allegedly ignored several potential exculpatory witnesses. Because the Court holds that petitioner was deprived of his right to present a defense, his petition is granted.

# BACKGROUND

The prosecution and defense presented two starkly different versions of the street altercation that led to petitioner's arrest. Both sides agreed, however, that it arose out of a dispute that petitioner had with a man named Kendel.[1]

## I. The Prosecution's Case

According to the prosecution, Kendel was one of five men retrofitting a car in the street. Two of the men had children present. Petitioner approached the group and confronted Kendel. Following some fighting between petitioner and Kendel after which petitioner drove away, petitioner returned to the scene shortly thereafter. By that time, Kendel had left. Petitioner aggressively confronted the other four men, demanding to know where Kendel had gone.

At that point, an off-duty police officer, Malcolm Palmer, who was the brother-in-law of Peter Blackman, one of the men who had been working on the car with Kendel, attempted to calm the situation. Officer Palmer was not one of the five car repairers, but he had seen the first exchange between petitioner and Kendel from his bedroom window, his wife Natasha having alerted him to it, and he came to the street as petitioner was initially departing.

When petitioner returned and engaged the other four car repairers and Officer Palmer attempted to diffuse the encounter, petitioner responded by punching Officer Palmer in the face and drawing a black semi-automatic handgun. Officer Palmer responded by drawing his own off-duty weapon. The two of them squared off under partial cover, although no shots were fired. Petitioner surrendered when Officer Palmer yelled at him that he was a police officer.

Petitioner complied with Officer Palmer's request to stay seated, although he refused to lie down. Petitioner then attempted to bribe Officer Palmer with a wad of cash in his shirt

---

[1] Also called "Kendu" or "Kendall."

pocket, saying that he was on parole and could not afford to be arrested. Officer Palmer demurred. Several witnesses to the events, including Officer Palmer's wife, had called 911, and petitioner was arrested when police units arrived minutes later. Officer Palmer had removed petitioner's handgun and gave it to the arresting officer, who vouchered it, although fingerprints were not lifted from the weapon.

The prosecution's theory of the case was supported by testimony from Officer Palmer; his wife Natasha; Blackman; and Yamin Parrish, who was also working on the car. For his part, Officer Palmer testified that he did not know who Kendel was prior to the incident. Further corroboration came from the 911 call that Officer Palmer's wife placed while the event was happening and another that Blackman had made. These two 911 calls described the events as they were unfolding in the same manner as the testimony of the prosecution witnesses.

Additional corroboration came from a disinterested witness, Jensyse Tanksley. Tanksley testified that she saw an individual – whom she could not identify – jump out of a truck, punch Officer Palmer in the face, and then draw a gun on him. She was sitting in her car at the time, and upon seeing the incident, called her father and asked him to call 911, which he did. She recognized Officer Palmer as a neighbor but did not know his name or otherwise have any relationship with him. Her story of an individual jumping out of his truck corroborated the testimony of all of the other witnesses about petitioner's return.

II. **The Petitioner's Case**

Petitioner, who testified on his own behalf, could not have offered a more different version of the events. It was a central theme of petitioner's case that Officer Palmer and Kendel were friends who regularly engaged in drag racing in the neighborhood; that Officer Palmer was lying when he said he didn't know Kendel; and that Officer Palmer had been supplying

3

protection for Kendel's drug business, or at least tacitly allowing it to proceed on the street in front of his house.

Petitioner testified that his dispute with Kendel arose from the fact that Kendel was a drug dealer and somehow got the misimpression that petitioner was trying to steal his customers. Kendel had warned petitioner to stay off his turf, and when petitioner returned, Kendel assaulted him. As they were struggling, Kendel pulled a gun. Petitioner bit him hard on the wrist and Kendel dropped the gun.

As petitioner was starting to get the upper hand (petitioner is trained as a boxer), Officer Palmer came up behind petitioner, grabbing petitioner from the back and putting him in a chokehold. Petitioner turned and it was then that he punched Officer Palmer in the face. Officer Palmer pulled his gun and began threatening and beating petitioner despite petitioner's submission. When Kendel attempted to retrieve the handgun that he had dropped, Officer Palmer, according to petitioner, told Kendel that he (Officer Palmer) "got this." Officer Palmer then put the gun in his back pocket and told Kendel to leave.

As to why Officer Palmer's wife had told the police in her 911 call that petitioner pulled a gun on Officer Palmer, petitioner testified that Officer Palmer had yelled for her to call 911 and say that as he held petitioner at gunpoint. Thus, according to petitioner, she was also lying in her testimony, as were Blackman and Parrish. Officer Palmer turned the handgun over to the arresting officers when they arrived, falsely telling them that he had taken it from petitioner. By these actions, Officer Palmer framed petitioner for the crimes.

### III. State Court Rulings

The trial court limited petitioner's counsel's ability to obtain many answers from witnesses – principally from petitioner, but also by striking testimony on cross-examination of Officer Palmer and his wife – about Kendel's alleged relationship with Officer Palmer and about Kendel's alleged drug dealing. Petitioner's trial counsel was left to make the jury aware of her theory about Officer Palmer and Kendel only by addressing it in her opening, closing, in her repeated attempts at questioning, and in her responses to the court's rulings sustaining objections (trial counsel's responses to and arguments about the trial court's rulings were frequently made in front of the jury, despite the trial court's admonitions to stop doing that). The trial court expressed the view that "[Kendel] was not on trial," and that proof of the alleged relationship between Kendel and petitioner was collateral to the issue of petitioner's innocence or guilt.

The Appellate Division and the New York Court of Appeals, which had granted leave to appeal, both found that the trial court's limitations on petitioner's attempt to present a defense were improper. Both courts also held, however, that the error was harmless. As the Court of Appeals stated:

> Defendant's alleged personal observations of complainant [Officer Palmer] and the third party [Kendel] described by counsel to the court supplied a good faith basis for defendant's proposed trial testimony. Moreover, the excluded evidence, if credited by the jury, tended to establish complainant's motive to protect the third party by inculpating defendant. Nevertheless, given the overwhelming independent proof adduced at trial, including the testimony of several other eyewitnesses who corroborated complainant's version of the events and the 911 calls admitted into evidence, we agree with the Appellate Division that the error was harmless beyond a reasonable doubt.

People v. Spencer, 20 N.Y.3d 954, 956-57, 959 N.Y.S.2d 112 (2012), aff'g, 87 A.D.3d 751, 928 N.Y.S.2d 607 (2nd Dep't 2011).

**DISCUSSION**

The Supreme Court has explained the standard for federal habeas corpus review of state court findings of harmless error in Brecht v. Abrahamson, 507 U.S. 619 (1993); Fry v. Pliler, 551 U.S. 112 (2007); and, most recently, in Davis v. Ayala, 135 S. Ct. 2187 (2015). This standard subsumes the deferential review standard applicable under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). See Davis, 135 S. Ct. at 2191. When a federal court reviews a state court finding of harmless error beyond a reasonable doubt under AEDPA, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." Fry, 551 U.S. at 119 (emphasis in original). And a state-court decision is not unreasonable if "'fairminded jurists could disagree' on [its] correctness." Harrington v. Richter, 562 U.S. 86, 88 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).[2]

A federal court, therefore, cannot grant relief in this situation if it merely finds a "reasonable possibility" that the error was harmful. Davis, 135 S. Ct. at 2197. Rather, habeas relief can only be granted if the court "'has grave doubt about whether a trial error of federal law had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 2197-98 (2015) (citing O'Neal v. McAninch, 513 U.S. 432, 436 (1995)). This conclusion must be supported, in turn, by a finding that the petitioner "was actually prejudiced by the error." Id. at 2198 (citing Calderon v. Coleman, 525 U.S. 141, 146 (1998) (per curiam)).

---

[2] Petitioner argues that the Court of Appeals applied an incorrect standard to determine if the alleged constitutional error was harmless. Specifically, he claims that the Court of Appeals impermissibly equated "harmless beyond a reasonable doubt" with "overwhelming . . . proof" of guilt, and that its holding is accordingly not entitled to AEDPA deference. Because the Court concludes that petitioner is entitled to relief even when it grants the Court of Appeals AEDPA deference, it need not resolve this claim.

Petitioner argues that the Court of Appeals erroneously concluded that the trial court's exclusion of testimony was harmless. This Court has grave doubt that the limitation of petitioner's case had a substantial effect on the jury, and finds that petitioner suffered actual prejudice.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal quotations omitted); see Wade v. Mantello, 333 F.3d 51, 57 (2d Cir. 2003) ("Supreme Court precedent makes clear that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense."). Indeed, "[t]he right to present a defense is one of the minimum essentials of a fair trial." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) (internal quotations omitted).

When a trial court excludes evidence relevant to a defense theory, "[it] is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." Id. at 925. The materiality of excluded evidence, in turn, is determined by considering whether the evidence's admission could have "create[d] a reasonable doubt that did not otherwise exist." Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000). "In a close case, additional evidence of relatively minor importance might be sufficient to create reasonable doubt." Id. (internal quotations omitted).

Several considerations lead to the conclusion that the trial court's exclusion of testimony about Officer Palmer's and Kendal's relationship caused petitioner to suffer actual prejudice.

First, as his trial counsel repeatedly tried to explain to the presiding judge, evidence regarding the alleged relationship between Officer Palmer and Kendel was critical to petitioner's "entire defense." Petitioner's theory was straightforward: the gun was Kendel's, not his, and

7

Officer Palmer framed him to protect Kendel. Of course, the viability of this defense turned on providing some explanation of why Officer Palmer, a law enforcement officer, would lie to implicate petitioner. That explanation is precisely what petitioner sought to introduce. Specifically, petitioner intended to testify that "[h]e saw Malcom Palmer and [Kendel] drag racing together and [saw Kendel] dealing drugs in front of the Palmer house[] . . . [and that] this was a constant, chronic thing. *They are very good friends . . .*" (emphasis added). Without this evidence of a relationship, which goes a long way to explaining Officer Palmer's alleged motivation to protect Kendel, petitioner's theory was virtually implausible. The court's exclusion of petitioner's testimony about Officer Palmer's and Kendel's association all but ensured that the jury would give little or no weight to his defense.

Second, the court's ruling not only undermined petitioner's affirmative presentation of a defense theory; it also greatly limited his ability to challenge the prosecution's case. This is because although petitioner's counsel aggressively cross-examined the prosecution's witnesses (including about Officer Palmer's and Kendel's relationship), the force of her questions was necessarily weakened because they appeared to be based on nothing but uncorroborated speculation. Given the lack of objective evidence like video footage or fingerprints, this case turned largely on whose account the jury credited. The case was essentially a "he said, she said," so undermining petitioner's ability to call into question the prosecution's witnesses was a severe blow. See e.g., United States v. Schoneberg, 396 F.3d 1036, 1044 (9th Cir. 2005) ("The case turned on who was telling the truth, Woodbury or Schoneberg, and the judge's rulings and admonitions left the jury completely understanding Schoneberg's motivation to lie, but not fully informed about Woodbury's."); United States v. Chandler, 326 F.3d 210, 224-25 (3d Cir. 2003)

("Because so much depended on the credibility of the cooperating witnesses, additional information about their motives in testifying might have proven decisive.").

Third, petitioner's counsel's opening and closing statements were also stripped of corroborating testimony. The trial court instructed the jury to note that arguments about the "frame-up" defense were only that, and were not supported by evidence in the record. When listening to counsel's explanation of petitioner's defense, therefore, the jury heard only theory without reference to evidence, was reminded that counsel's argument was without supporting evidence, and could have easily concluded that petitioner had nothing to support his case.

Fourth, this Court cannot agree with the state courts that the evidence against petitioner was "overwhelming." The significance of the exclusion is heightened because the prosecution's case "was not a 'slam-dunk' prosecution where the evidence overwhelmingly weighed toward conviction." Zappulla v. New York, 391 F.3d 462, 473-74 (2d Cir. 2004) (holding that the erroneous admission of the defendant's confession at trial could not reasonably be considered harmless because "the prosecution's theory was marred with discrepancies, inconsistencies, unreliable and conflicting testimony, shoddy forensic evidence, and logical gaps (*e.g.,* the lack of a motive, an inconsistent time line)."). "The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless." Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (internal quotations omitted).

For one thing, the police did not attempt to lift fingerprints from the gun Officer Palmer recovered at the scene. For another, the prosecution did not produce Kendel, who was obviously central to the events leading to petitioner's arrest. Furthermore, the money that petitioner allegedly offered to Officer Palmer as a bribe was never secured or introduced into evidence.

9

Most significantly, though, is the fact that the prosecution's witnesses offered frequently contradictory testimony, undercutting their credibility and the prosecution's theory of the case, and making it more likely that the jury would credit an alternative account. For instance, Blackman testified that at the time of the altercation, he and several others were working on Kendel's car outside of Officer Palmer's home – and even described the work they were doing. But Parrish, a friend of Officer Palmer, rejected this, stating that no one was working on a car that day. Blackman also claimed that when petitioner first arrived at Officer Palmer's home, Kendel was in the backyard; Parrish, on the other hand, who claimed to have been in the backyard at the time, denied that Kendel had ever gone to the back. Although several prosecution witnesses testified that petitioner had a gun, Tanksley claimed that the person she saw with a gun had left the scene before the police arrived.

Finally, the prosecution's cross-examination of petitioner did not leave his credibility severely damaged. His account was coherent and his trustworthiness was not materially impaired by the prosecution's questioning. He offered viable explanations for seeming discrepancies between his testimony at trial and that he gave before the Grand Jury. There is no reason to believe that the jury would have rejected out of hand the testimony he sought to offer.

**CONCLUSION**

The jury found petitioner guilty without hearing erroneously excluded testimony critical to his theory of defense and damaging to the credibility of the prosecution's witnesses. The Court has grave doubt that this error of federal law had a substantial and injurious effect or influence in determining the jury's verdict. See Stinson, 229 F.3d at 120. The excluded testimony was sufficient to create a reasonable doubt as to petitioner's guilt. See Id. Because

the Court so concludes, it is unnecessary to reach petitioner's claim of ineffective assistance of counsel.

The petition is granted. Respondent is directed to release defendant within 60 days, unless the District Attorney commits to retrying petitioner prior to the expiration of that period. The Clerk is directed to enter a judgment consisting of a writ of habeas corpus consistent with this direction.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       July 6, 2018