```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
ANDREW SPENCER,                                             :
                                                            :
                          Petitioner,                       :
                                                            :     **MEMORANDUM DECISION**
              - against -                                   :     **AND ORDER**
                                                            :
MICHAEL CAPRA,                                              :     17-CV-2179 (BMC)
                                                            :
                          Respondent.                       :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from his conviction on one count of second degree criminal weapons possession, two counts of third degree criminal weapons possession, one count of third degree assault, and one count of second degree menacing. The facts will be set forth more fully below, but to summarize, petitioner's conviction arose out of a street fight during which he allegedly punched and then pulled a gun on an individual who, unbeknownst to him, was an off-duty police officer. He was sentenced to 15 years on the top count with lesser sentences on the other counts to run concurrently.

In 2018, this Court granted petitioner's petition on the ground that, contrary to the finding of the state appellate courts, the trial court's restriction of his testimony was not harmless error. Because I granted habeas corpus relief, I did not reach his alternative claim. In that claim, he asserted that he received ineffective assistance of counsel.

Respondent appealed and the Second Circuit reversed. Because my original decision had not reached petitioner's ineffective assistance of counsel claim, the Court of Appeals remanded for determination of that issue, and it is before me now.

# BACKGROUND

As described in the Court's initial decision and recounted here, the prosecution and defense presented starkly different versions of the street altercation that led to petitioner's arrest. Both sides agreed that it arose out of a dispute that petitioner had with a man named Kendel.[1]

## I. The Prosecution's Case

According to the prosecution, Kendel was one of five men retrofitting a car in the street when he was approached and confronted by petitioner. Petitioner and Kendel fought and then petitioner drove away. Petitioner returned shortly thereafter but, by that time, Kendel had left. Petitioner aggressively confronted the other four men, demanding to know where Kendel had gone.

An off-duty police officer, Malcolm Palmer, who was the brother-in-law of Peter Blackman, one of the men who had been working on the car with Kendel, attempted to calm the situation. Officer Palmer was not one of the men working on the car, but his wife had alerted him to the exchange between petitioner and Kendel, and Officer Palmer had seen part of it from his bedroom window. He came to the street as petitioner was leaving.

When petitioner returned and engaged the other four car repairers and Officer Palmer attempted to diffuse the encounter, petitioner responded by punching Officer Palmer in the face and drawing a black semi-automatic handgun. Officer Palmer responded by drawing his own off-duty weapon. The two of them squared off under partial cover, although no shots were fired. Petitioner surrendered when Officer Palmer yelled at him that he was a police officer.

Petitioner complied with Officer Palmer's request to stay seated but refused to lie down. He then attempted to bribe Officer Palmer with cash, saying that he was on parole and could not

---

[1] Also called "Kendu" or "Kendall."

afford to be arrested. Officer Palmer demurred. Multiple witnesses to the events, including Officer Palmer's wife, had called 911, and petitioner was arrested when police units arrived minutes later. Officer Palmer had removed petitioner's handgun and gave it to the arresting officer, who vouchered it, although fingerprints were not lifted from the weapon.

The prosecution's theory of the case was supported by testimony from Officer Palmer; his wife Natasha; Blackman; and Yamin Parrish, who was also working on the car. For his part, Officer Palmer testified that he did not know who Kendel was prior to the incident. Further corroboration came from the 911 call that Officer Palmer's wife placed while the event was happening and another that Blackman had made. These two 911 calls described the events as they were unfolding in the same manner as the testimony of the prosecution witnesses.

Additional corroboration came from a disinterested witness, Jensyse Tanksley. Tanksley testified that she saw an individual – whom she could not identify – jump out of a truck, punch Officer Palmer in the face, and then draw a gun on him. She was sitting in her car at the time, and upon seeing the incident, called her father and asked him to call 911, which he did. She recognized Officer Palmer as a neighbor but did not know his name or otherwise have any relationship with him. Her story of an individual jumping out of his truck corroborated the testimony of all of the other witnesses.

## II.  Petitioner's Case

Petitioner, who testified on his own behalf, offered a very different version of the events. It was a central theme of petitioner's case that Officer Palmer and Kendel were friends who regularly engaged in drag racing in the neighborhood; that Officer Palmer was lying when he said he didn't know Kendel; and that Officer Palmer had been supplying protection for Kendel's drug business, or at least tacitly allowing it to proceed on the street in front of his house.

Petitioner testified that his dispute with Kendel arose from the fact that Kendel was a drug dealer and somehow got the misimpression that petitioner was trying to steal his customers. Kendel had warned petitioner to stay off his turf, and when petitioner returned, Kendel assaulted him. As they were struggling, Kendel pulled a gun. Petitioner bit him hard on the wrist and Kendel dropped the gun.

Officer Palmer came up behind petitioner, grabbing him from the back and putting him in a chokehold. Petitioner turned and it was then that he punched Officer Palmer in the face. Officer Palmer pulled his gun and began threatening and beating petitioner. When Kendel attempted to retrieve the handgun that he had dropped, Officer Palmer, according to petitioner, told Kendel that he (Officer Palmer) "got this." Officer Palmer then put the gun in his back pocket and told Kendel to leave.

As to why Officer Palmer's wife had told the police in her 911 call that petitioner pulled a gun on Officer Palmer, petitioner testified that Officer Palmer had yelled for her to call 911 and say that. Thus, according to petitioner, she was also lying in her testimony, as were Blackman and Parrish. Officer Palmer turned the handgun over to the arresting officers when they arrived, falsely telling them that he had taken it from petitioner. By these actions, Officer Palmer framed petitioner for the crimes.

### III. State Court Rulings and Prior History

The trial court limited defense counsel's ability to obtain many answers from witnesses – principally from petitioner, but also by striking testimony on cross-examination of Officer Palmer and his wife – about Kendel's alleged relationship with Officer Palmer and about Kendel's alleged drug dealing. Petitioner's trial counsel attempted to make the jury aware of her theory about Officer Palmer and Kendel by addressing it in her opening and closing statements, in her repeated attempts at questioning, and in her responses to the court's rulings sustaining

objections. The trial court expressed the view that "[Kendel] was not on trial," and that proof of the alleged relationship between Kendel and petitioner was collateral to the issue of petitioner's innocence or guilt.

At trial, in addition to his testimony as described above, petitioner also presented the testimony of his mother. She testified that she arrived at the scene of the altercation after she was called by one of petitioner's friends; that she saw Officer Palmer pointing his gun at her son and threatening him; and that she begged Officer Palmer not to kill her son.

The Appellate Division and the New York Court of Appeals, on a grant of leave to appeal, found that the trial court constitutionally erred in limiting petitioner's attempt to present a defense. People v. Spencer, 87 A.D.3d 751, 928 N.Y.S.2d 607 (App. Div. 2011), aff'd, 20 N.Y.3d 954, 982 N.E.2d 1245 (2012). Both courts also held, however, that the error was harmless. The appellate courts found that the evidence of petitioner's guilt was "overwhelming" because Officer Palmer's testimony was supported by other witnesses who observed the incident, and thus there was no reasonable possibility that the trial court's error might have contributed to the conviction.

Petitioner subsequently filed a *pro se* motion to vacate the judgment pursuant to Criminal Procedure Law § 440.10. He argued that his trial counsel, Tamara Harris, Esq., failed to interview and call witnesses that would have (i) affirmed that Kendel was a drug dealer, involved in drag racing, and took bets in front of Officer Palmer's home, and (ii) testified as to their observations of the altercation between petitioner and Kendel. The motion annexed affidavits from each of the following individuals:

- Dgemane Remy would have testified that she personally purchased drugs from Kendel in front of Officer Palmer's home and placed bets with Kendel. According to petitioner, his trial counsel told him that Ms. Remy would not be a good witness because she had a close affiliation with petitioner's mother.

5

- Tracy Ann Patterson would have testified that she witnessed Kendel car racing in the neighborhood and selling drugs. According to petitioner, counsel told him that she would contact Ms. Patterson but never did.

- Maxie Dacosta would have testified that he saw someone holding a gun on petitioner on the night in question and went to petitioner's mother's home to tell her what he had seen, but she was not there. According to petitioner, counsel told him that she did not call Mr. Dacosta as a witness because of his close affiliation with petitioner's mother.

- Eugene Christie would have testified that he saw Kendel holding a gun in petitioner's face on the night in question, went to a neighbor's house to tell someone, and later told petitioner's mother. He was told that he was not contacted by trial counsel because he had a criminal record.

- Antoinette Gordon would have testified that she witnessed Kendel selling drugs while Officer Palmer was standing next to him. She stated that she provided this information to trial counsel early in the case but was not further contacted about it.

- Ventia Spencer, petitioner's mother, did testify at trial. Petitioner claims that his trial counsel was sidetracked by the judge's interruptions during Ms. Spencer's testimony and thus Ms. Spencer was prevented from testifying that she saw Kendel and Palmer removing parts from cars with other people.

The state court denied the § 440 motion. Apparently, it adopted the State's argument that petitioner's claim was subject to a mandatory procedural bar because the appellate courts found no prejudice from the exclusion of evidence about Officer Palmer and Kendel's alleged relationship. The § 440 court first held that "defendants [sic] claim was already adjudicated and rejected by the Appellate Division on his direct appeal and [therefore] must be denied." It also held "that the defendants [sic] motion papers fail to allege any ground constituting a legal basis to set aside his judgements [sic]."

Petitioner then filed the instant proceeding for habeas corpus relief. In a prior decision, I granted the petition. Applying Brecht v. Abrahamson, 507 U.S. 619 (1993) (an error is harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict"), I found that that the state appellate courts' harmless error determination raised more than a

reasonable possibility that the error was harmful. I did not reach petitioner's claim based on ineffective assistance of counsel.

In reversing, the Second Circuit disagreed with my application of Brecht. It found that "fairminded jurists could disagree" as to whether the error had a substantial and injurious effect on the jury's verdict, citing Harrington v. Richter, 562 U.S. 86, 101 (2011), and therefore petitioner had not met the standard for habeas corpus relief. The Second Circuit remanded the case for a determination of petitioner's ineffective assistance claim. This meant that I was to review the § 440 court's decision on whether petitioner received ineffective assistance of trial counsel.

On remand, I conducted an evidentiary hearing, at which I received testimony from petitioner's former attorney, Tamara Harris, in response to petitioner's allegations. She testified that she did not have a clear recollection of the state court proceedings in this case, but that she vividly recalled arguing with the trial court judge about the deprivation of petitioner's right to present a defense, as well as a circus-like atmosphere in the courtroom. She did not recall any of the witnesses cited by defendant except Ms. Gordon, who she recalled speaking to after the trial. She did not recall her conversations with petitioner about identifying and locating any witnesses and did not have any notes from her representation.

## DISCUSSION

**I.     Procedural Bar**

In ruling that petitioner's ineffective assistance claim "was already adjudicated and rejected by the Appellate Division on his direct appeal and [therefore] must be denied", the § 440 court implicitly relied upon the procedural bar of New York Criminal Procedure Law § 440.10(2)(a). That statute precludes consideration of a challenge to a conviction where "[t]he

7

ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment." The first issue before me is therefore whether the § 440 court's procedural ruling bars federal habeas corpus review of the merits of petitioner's claim.

This issue arises because a federal court should not address the merits of a habeas claim if a state court has rejected the claim on "a state law ground that is independent of the federal question and adequate to support the judgment." Lee v. Kemna, 534 U.S. 362, 375 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)) (emphasis omitted). When a state court rejects a petitioner's claim because he failed to comply with a state procedural rule, the procedural bar may constitute an independent and adequate ground for the state court's decision. See, e.g., Coleman, 501 U.S. at 729–30; Murden v. Artuz, 497 F.3d 178, 193 (2d Cir. 2007). State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established and regularly followed" in the state. Murden, 497 F.3d at 192 (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)).

Many cases have held that C.P.L. § 440.10(2)(a) is a firmly established and regularly followed procedural bar to federal habeas corpus review. See, e.g., Evans v. Ericole, No. 06-CIV-3684, 2008 WL 4861783, at *7 (S.D.N.Y. Nov. 10, 2008); Miller v. Boucaud, No. 09-cv-6598, 2012 WL 3262426, at *7 (W.D.N.Y. Aug. 8, 2012) (citing Cruz v. Berbary, 456 F. Supp. 2d 410, 419 (W.D.N.Y. 2006)); Encarnacion v. Walker, No. 96-cv-329, 1998 WL 34002608, at *4 (N.D.N.Y. Aug. 21, 1998).[2] Section 440.10(2) is consistent with its common law antecedent,

---

[2] Relying on a pre-AEDPA decision, Silverstein v. Henderson, 706 F.2d 361, 368 (2d Cir. 1983), some cases hold that C.P.L. § 440.10(2)(a) constitutes a decision on the merits for purposes of habeas corpus review. See Soberanis v. Brown, No. 10-cv-2695, 2014 WL 5038364, at n.1 (S.D.N.Y. Sept. 20, 2014) (collecting cases going both ways). Silverstein reasoned that there cannot be a procedural "default" when, in fact, plaintiff has raised the claim. I think the understanding of "procedural bar" under AEDPA is broader than just a default, although of course a procedural default can give rise to a procedural bar. In part, this is because when a state court relies on C.P.L. § 440.10(2)(a), it is using it to avoid reaching the merits of the claim, so that its ruling cannot be considered a decision on the merits. My view is that whenever a state court avoids ruling on the merits of a claim, the question before the federal habeas court applying AEDPA is whether state law imposed a procedural impediment to state court review of the merits. If

the writ of *coram nobis,* as that writ was only available to raise issues based on matters outside the trial record. See Lyons v. Goldstein, 290 N.Y. 19, 47 N.E. 425 (1943). The rule makes perfect sense – without that rule, not only would a defendant have the opportunity to raise the same argument multiple times, but it would require the state *nisi prius* court to review whether there was error in prior decisions of the appellate court on direct appeal in the same case.

However, even where a state court procedural rule is firmly established and regularly followed, it will not bar federal habeas corpus review if the state court applied that rule "exorbitantly." "Exorbitance" in this context essentially means that the rule was applied in a manner that does not comply with state law. See Fulton v. Graham, 802 F.3d 257, 262-63 (2d Cir. 2015).

That is the case here. The § 440 court plainly erred in concluding that petitioner had already raised his ineffective assistance of counsel claim on direct appeal. A review of the submissions to the Appellate Division and Court of Appeals shows that he did not. It is true that both his claim on direct appeal that he had been denied his Sixth Amendment right to present a defense and his ineffective assistance claim in his § 440 motion related to his factual theory that Kendel was in cahoots with Officer Palmer. But the legal issue for each claim was entirely different – the deprivation of defense claim asserted an error by the trial court, while the § 440 motion asserted an ineffective assistance claim against petitioner's trial counsel. The record was also entirely different – the Sixth Amendment claim was based on the trial court's rulings during the trial, while the § 440 motion was based on affidavits from witnesses who the trial court had never heard of let alone seen. Indeed, because petitioner's § 440 motion relied on affidavits that

---

it did, a federal court applying AEDPA should treat that under the Supreme Court's post-AEDPA procedural bar cases. Whether the state court properly, as opposed to exorbitantly, imposed a procedural bar, as in the instant case, is another question.

9

were outside the record, petitioner, under well-established New York procedure, could not have raised his ineffective assistance claim on direct appeal even if he had wanted to. See, e.g., Louis v. Fischer, No. 04-cv-2887, 2007 WL 4198255, at *21 (E.D.N.Y. June 25, 2007).

Because petitioner's ineffective assistance of counsel claim is not procedurally barred, I will review the claim on its merits.

## II. The Merits

### A. Standard of Review

The next question is the standard of review applicable to my consideration of the merits of petitioner's ineffective assistance claim.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a court must first determine whether a petitioner's claim "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); see Jimenez v. Walker, 458 F.3d 130, 135 (2d Cir. 2006). "[I]t can sometimes be difficult to decide whether a state court rested its judgment on the merits of the federal claim or on an independent procedural rule" because state court decisions can be "somewhat opaque." Jimenez, 458 F.3d at 136. But "when a state court adjudicates a petitioner's habeas claim on the merits, a district court may only grant relief where the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law,' or was 'based on an unreasonable determination of the facts in light of the evidence presented.'" Waiters v. Lee, 857 F.3d 466, 477 (2d Cir. 2017) (quoting 28 U.S.C. § 2254(d)). AEDPA requires "substantial deference to the state court's decision." Id. The issue is not whether the state court's determination was incorrect, but rather whether that determination was objectively unreasonable – "a substantially higher threshold." Id. at 478 (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). Accordingly, to justify relief, a petitioner must establish

"that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. (quoting Harrington, 562 U.S. at 103).

In contrast, if the state court did not rule upon the merits of the defendant's claim, then habeas corpus review in this Court is *de novo*.  See Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007).

In this case, in addition to invoking the procedural bar discussed above, the trial court stated: "This court finds that the defendants [sic] motion papers fail to allege any ground constituting a legal basis to set aside his judgements [sic]."  This sentence does not sufficiently indicate that the trial court considered the merits of petitioner's § 440 motion and the accompanying affidavits.  The state court's awareness of the procedural bar and express invocation of it demonstrate that the decision rests primarily on state procedural law.  Jimenez, 458 F.3d at 138, 140–41.

Even though the District Attorney had also argued to the § 440 court that petitioner's claim failed on the merits, there is no indication that the court considered that argument.  The court only stated that petitioner's motion "fail[ed] to allege any ground constituting a legal basis to set aside" his judgments.  This language does not implicate any decision on the merits; rather, the court appears to have based its ruling entirely on its misreading of the decisions of the appellate courts.  Accordingly, AEDPA deference does not apply to the state court's resolution of petitioner's ineffective assistance of counsel claim, and I will review the claim *de novo*.  See Acevedo v. Capra, No. 13-cv-5579, 2014 WL 1236763, at *17 (E.D.N.Y. Mar. 25, 2014) ("[T]he proper standard of review is de novo, because petitioner has done all that state law allows him to

11

do to exhaust his ineffective assistance claim, and yet no state court has considered that claim in its totality. There is thus no state court decision to which AEDPA deference can be accorded.").

### B. Merits of the Claim

Petitioner claims that his trial counsel, Ms. Harris, was ineffective because she failed to interview and call at trial witnesses that would have (i) affirmed that Kendel was a drug dealer, involved in drag racing, and took bets in front of Officer Palmer's home, and (ii) testified as to their observations of the altercation between petitioner and Kendel.

"To succeed on an ineffective assistance claim, a defendant must demonstrate, first, that 'in light of all the circumstances,' the acts or omissions of trial counsel 'were outside the wide range of professionally competent assistance,' and, second, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. Nolan, 956 F.3d 71, 79 (2d Cir. 2020) (quoting Strickland v. Washington, 466 U.S. 668, 690, 694 (1984)). "This test presents a high bar for a defendant, as Strickland instructs courts to apply a 'presumption of effective performance.'" Id. (quoting Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005)). "The standard of Strickland 'is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on [it].'" Id. (quoting Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007)).

A district court facing the question of constitutional ineffectiveness of counsel should offer the assertedly ineffective attorney an opportunity to be heard and to present evidence because "legitimate strategic considerations that may have guided an attorney's conduct are not always 'transparent on a cold record.'" Greiner, 417 F.3d at 320 n.16 (quoting Eze v. Senkowski, 321 F.3d 110, 136 (2d Cir. 2003)). Ms. Harris submitted an affidavit and a hearing was held to obtain her testimony. But Ms. Harris could recall few details from her representation

of petitioner. She did not remember being informed about petitioner's proposed witnesses or any reason why she would not have interviewed or called them. Nor did Ms. Harris have any notes from her representation that could have provided additional information.

"Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland presumption of effective performance." Greiner, 417 F.3d at 326. Thus, "the fact that [an attorney] no longer remembers [her] reason for [a] decision does not preclude a determination that [petitioner] failed to establish constitutionally defective representation." Waiters, 857 F.3d at 478. But Ms. Harris's lack of memory and notes does make it more difficult to resolve this case.

As an initial matter, petitioner's claim faces a hurdle to the extent that it is based on his counsel's decision not to call certain witnesses at trial. "Strickland ordinarily does not require defense counsel to call any particular witness." Nolan, 956 F.3d at 82. "[C]ounsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (citation omitted). That is because "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) (citation omitted); cf. United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) (counsel's performance was objectively reasonable where he "contacted potential witnesses and considered the utility of their testimony" even though "it was ultimately decided not to call most of these witnesses").

But counsel's decision not to call witnesses is not a trial tactic if counsel was unaware of their proposed testimony due to a failure to investigate. See Greiner, 417 F.3d at 325 ("[C]ourts

13

have found deficient performance where counsel's conduct resulted from an entirely absent investigation . . . ."); Schulz v. Marshal, 345 F. App'x 627, 629 (2d Cir. 2009) (in case with two eyewitnesses and differing theories as to who committed the crime, "any reasonably competent attorney would have made vigorous efforts to interview" one of those eyewitness before trial). "The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.'" Greiner, 417 F.3d at 320 (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)). "The duty requires counsel 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Id. at 320–21 (quoting Strickland, 466 U.S. at 691). "It does not, however, compel defense counsel to investigate comprehensively every lead or possible defense, or to scour the globe on the off-chance something will turn up." Id. at 321 (cleaned up). Further, if counsel learns from the defendant what defendant's proposed witnesses would testify to and makes a reasonable decision not to call those witnesses, that decision can make interviewing the witnesses unnecessary. See Momplaisir v. Capra, No. 13 CIV. 6118, 2021 WL 694187, at *2 n.2 (S.D.N.Y. Feb. 23, 2021) (citing Strickland, 466 U.S. at 691).

This is a close case. The Second Circuit noted that petitioner "did not purport to offer any evidence beyond his own testimony to support his theory that he was framed by Officer Palmer," and the affidavits show that there were at least a few witnesses who might have circumstantially corroborated petitioner's story. However, under the high bar to establish ineffective assistance of counsel, I conclude that petitioner's arguments as to each witness are insufficient under Strickland.

First, petitioner asserts that he told his counsel that Ms. Remy purchased drugs from Kendel in front of Officer Palmer's home and was willing to testify to that effect. Petitioner claims that Ms. Harris told him that Ms. Remy "would not be a good witness because of her affiliation with [petitioner's] mother" – Ms. Remy having rented a room from petitioner's mother for seven years. Even though Ms. Harris could not recall this or any other conversation, petitioner's own assertions demonstrate that he informed Ms. Harris of the witness's proposed testimony. Thus, Ms. Harris could have made a tactical decision not to call this witness. This arguably would have been a reasonable decision that made further investigation unnecessary considering the limited probative value of this witness's proposed testimony. Ms. Remy did not witness the altercation at issue, her testimony concerned Kendel's activities alone and he was not a witness at trial, and her testimony does not implicate Officer Palmer's credibility or the petitioner's frame-up theory.[3]

Second, petitioner states that Ms. Patterson would have similarly testified that she saw Kendel car racing, removing parts from cars, and selling drugs. Petitioner claims he "brought this information to the attention of Ms. Harris" whose "only response was that she would get back to Ms. Patterson at a [later] date." A reasonable attorney could have concluded that further investigation of Ms. Patterson's knowledge was unnecessary because Ms. Patterson did not witness any part of the altercation at issue. Further, her testimony concerned activities of Kendel about which petitioner and his mother intended to testify. Thus, her testimony was not crucial and was potentially duplicative.[4]

---

[3] Ms. Remy's declaration does not suggest that Officer Palmer knew that Kendel was selling drugs in front of his home or that they had any arrangement permitting that activity.

[4] Unlike Ms. Remy's declaration, Ms. Patterson's declaration connects Kendel's activities to Officer Palmer. She states that she saw Kendel spending time at Officer Palmer's residence and saw Officer Palmer racing cars with a group of young men. However, petitioner does not suggest that he told Ms. Harris about this aspect of the

15

Third, petitioner asserts that defense counsel should have called Mr. Dacosta as a witness. Mr. Dacosta, a friend of petitioner and his mother, witnessed part of the altercation. He would have testified that he saw a person holding a gun on petitioner that night, backpedaled down the street, and went to petitioner's mother's house to tell her what he saw. According to petitioner, Ms. Harris decided not to call Mr. Dacosta as a witness because of his close affiliation with petitioner's mother.[5]

Because Mr. Dacosta witnessed a portion of the altercation and had information that could bolster petitioner's theory that the gun was Kendel's and not his, a reasonable attorney would have considered whether to call Mr. Dacosta at trial. And the record arguably suggests that Ms. Harris did just that: petitioner states that Ms. Harris considered whether to call Mr. Dacosta as a witness but decided against it because of his close friendship with petitioner and his mother. This would have been a tactical decision and thus would not constitute ineffectiveness. See Best, 219 F.3d at 201–202.

Fourth, Mr. Christie similarly would have testified that he was on his way "to purchase some weed at [Officer] Palmer's place" from Kendel, the "weed man," when he saw Kendel holding a gun on petitioner on the night in question. He later told petitioner's mother what he saw. Mr. Christie states that petitioner's mother told Mr. Christie that Ms. Harris did not call him as a witness because of his "bad criminal record." Even if this evidence was not hearsay, it again arguably suggests that the decision not to call Mr. Christie was not the result of an "entirely absent investigation," but rather was a tactical decision by Ms. Harris. Greiner, 417

---

testimony. Even if he had, I cannot find on this record that the decision not to call this witness would have been so unreasonable as to constitute deficient performance by counsel.

[5] Petitioner states that he provided this explanation to Mr. Dacosta, but Mr. Dacosta states that petitioner's mother told him about counsel's justification for not calling him as a witness.

16

F.3d at 325. And even if I disregard the chain of statements, Mr. Christie's affidavit confirms that he has a criminal history; in fact, he was incarcerated at the time he signed it. A reasonable attorney could decide that Mr. Christie's testimony would not have aided petitioner's case in light of the witness's criminal history.

Fifth, Ms. Gordon would have testified that she saw Kendel selling drugs while Officer Palmer stood next to him and saw the two racing cars together. Ms. Gordon recalls giving this information directly to petitioner's lawyer early in the case. Because Ms. Harris was informed of the witness's knowledge of certain facts and willingness to testify, there arguably was no need to further interview Ms. Gordon if counsel had no intention of calling that witness at trial. See Momplaisir, 2021 WL 694187, at *2 n.2. Although petitioner contends that Ms. Harris should have called Ms. Gordon as a witness at trial, there is no requirement that defense counsel call any particular witness. Nolan, 956 F.3d at 82. Further, the proposed testimony was not crucial evidence for the defense, cf. Bryant v. Thomas, 274 F. Supp. 3d 166, 190 (S.D.N.Y. 2017) (ineffective assistance where counsel failed to investigate crucial serological evidence), aff'd, 725 F. App'x 72 (2d Cir. 2018), but merely would have corroborated petitioner's own testimony. Thus, a reasonable attorney could have decided not to call this witness.

Finally, petitioner contends that counsel failed to elicit testimony from petitioner's mother at trial about Officer Palmer and Kendel's dealings because counsel "became side traced [sic] by the judge [sic] interruptions." As described above, the trial court excluded evidence about the alleged corrupt relationship between Kendel and Officer Palmer. Trial counsel strongly objected to the exclusion of that evidence, repeatedly stating that the court was "depriving [petitioner] of the right to render a defense in the case" and that she would appeal the decision if he was found guilty. At one point, the court told Ms. Harris: "I am going to berate

17

you in front of the jury if you disobey my rulings" by attempting to "bring out any information with respect to [Officer] Palmer's alleged relationship with Kendel."

Having objected to the exclusion of this evidence and been overruled by the trial court, it would be reasonable for Ms. Harris to refrain from eliciting the excluded testimony when examining Ms. Spencer. It is not deficient performance for counsel to refrain from making or drawing further objections after evidence's admissibility has already been resolved. See Pham v. Kirkpatrick, 209 F. Supp. 3d 497, 508 (N.D.N.Y. 2016), aff'd, 711 F. App'x 67 (2d Cir. 2018); cf. United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (decisions regarding the timing and grounds for objections are "virtually unchallengeable absent exceptional grounds"); Feliciano v. United States, No. 01 CIV. 9398, 2004 WL 1781005, at *5 (S.D.N.Y. Aug. 10, 2004) ("Just as the failure to file frivolous motions cannot constitute ineffective assistance of counsel, defense counsel has no duty to make offerings of inadmissible evidence."). A reasonable attorney would not seek to elicit testimony that has already been excluded by the trial court, particularly if there is a risk of being "berate[d]" in front of the jury for failing to comply with the court's rulings.

Petitioner's motion thus fails to overcome the presumption of effective performance. Because I conclude that counsel's performance was not deficient, I do not consider the second prong of the Strickland analysis. See Greiner, 417 F.3d at 319 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." (quoting Strickland, 466 U.S. at 697)).

## CONCLUSION

The motion is denied, and the case is dismissed. A certificate of appealability shall issue with regard to petitioner's claim of ineffective assistance of counsel. See 28 U.S.C. § 2253(c);

Buck v. Davis, 137 S. Ct. 759, 773 (2017) (certificate of appealability warranted if "jurists of reason could disagree with the district court's resolution of [petitioner's] constitutional claims").

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
       June 30, 2021